388 So.2d 157 (1980)
Eric COLEMAN
v.
STATE of Mississippi.
No. 52012.
Supreme Court of Mississippi.
September 24, 1980.
Jerry L. Mills, Johnson & Mills, Clinton, for appellant.
Bill Allain, Atty. Gen. by Catherine Walker Underwood, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before SMITH, P.J., and SUGG and COFER, JJ.
SUGG, Justice, for the Court:
Eric Coleman was convicted in the Circuit Court of the First Judicial District of Hinds County for the unlawful sale of cocaine, and was sentenced to serve a term of twelve (12) years with seven (7) years suspended, plus a $2,000 fine.
On appeal, Coleman assigns as error: (1) the refusal of the trial court to permit him to question his codefendant, Connie Thompson, in the presence of the jury; (2) the indictment failed to allege the commission of a crime; and (3) the state failed to meet the burden of proving each and every element of the crime.
L.C. Russell, a member of the Jackson Police Department, testified that Coleman sold him four packets of cocaine for the sum of $200 on April 7, 1978, and that both Coleman and Connie Thompson participated in the sale. Russell said he discussed the price and quality of the cocaine with Coleman while Connie Thompson assisted in passing the cocaine and money back and forth between him and Coleman. The state proved that the substance sold to Russell contained cocaine. Officers Malone and Fitzgerald observed the scene of the sale from their surveillance position across from the Palm Garden Lounge. They were able to determine that the car in which the sale took place was registered to Coleman.
*158 Coleman testified that he took his lover, Connie Thompson, to the Palm Garden Lounge on April 7, 1978 at her request where they were met by a man called Derrick and Officer Russell. Coleman denied that he either possessed or sold cocaine on that occasion. He said Derrick tried to hand him some money while Connie Thompson was out of the car but withdrew it when Coleman asked what the money was for, and that Derrick handed the money to Connie Thompson when she returned to the car.
Coleman testified that he went to see Connie Thompson about 4:00 o'clock p.m. on April 7 while she was at work. He stated that Connie had just obtained a cash loan of $300 which she asked him to keep for her until she got off from work. Coleman said he went to his apartment, left his wallet in the apartment, and went to the laundry room about 7:00 o'clock p.m. While he was in the laundry room he claims that an unknown person entered his apartment and stole his wallet which contained the $300. He reported the theft to Connie but said she was upset and did not believe him; nevertheless, she called him about 10:30 o'clock p.m. to take her to the Palm Garden Lounge.
At his trial, Coleman called Connie Thompson as a witness. After testifying that she and Coleman were lovers on April 7, 1978, she was asked if anything unusual happened on that day. At that point, the jury was excused and she was advised of her right to remain silent under the Fifth Amendment to the United States Constitution. She invoked this right during further questioning out of the presence of the jury. Connie Thompson's attorney was called to the courtroom for the purpose of conferring with her and the court explained to the attorney what had transpired in the following words:
BY THE COURT: It is my understanding that Mr. Gearheard wishes to elicit from this witness the testimony that she obtained a loan from the Veterans Administration Savings & Loan Association of approximately $300.00 on April the 7th, 1978, and that she turned it over to the Defendant, Eric Coleman. That's the way I understand the testimony. And further that he lost the money and that a quarrel developed between the two, the implication being that she was the one that called the confidential informant or the police.
Connie Thompson's attorney stated:
BY MR. GILMER: Your Honor, I am informed and believe that she is charged by way of indictment with the same crime on the same day and I would have to instruct her not to answer any questions pertaining to any facts immediately prior to that day with the exception of her name and so forth. I feel like that the inference-to make the record, I don't intend to prejudice her on that for her day in court.
Coleman's attorney then stated:
BY MR. GEARHEARD: I firmly believe, Your Honor, that the Jury is given the right to let her claim the Fifth Amendment. This is a case, Your Honor, that's just very basic. Either Eric Coleman sold the cocaine or Connie Thompson sold the cocaine. If indeed and in fact, which she's already testified to, that she did receive $300.00 on the day in question and that Eric Coleman misplaced, stole or whatever that $300.00 and she was mad at him and a quarrel ensued and because of this, a call was made to an undercover agent, who called Officer Russell and Russell got the money from Officer True-love and therefore, to recoup some of the money that was lost, she set up the sale 
The court then refused to permit Coleman to recall Connie Thompson and have her either answer questions or claim her right to remain silent in the presence of the jury. As a result, the jury heard no further testimony from Connie Thompson and did not know she claimed her Fifth Amendment rights.
When this case was tried, this Court had previously considered the right of a defendant to call a witness when it was known that the witness would claim the Fifth Amendment right to refuse to answer questions. *159 Stewart v. State, 355 So.2d 94 (Miss. 1978). In Stewart, we held it was reversible error to refuse to permit the defendant to call as a witness another person involved in the altercation which was the subject of the criminal prosecution. The fact that the witness would refuse to answer most of the questions asked on the grounds that they might incriminate him was held not to bar a defendant's right to call and question witnesses in his behalf.
The evidence in this case is conflicting and it shows that either Coleman or Connie Thompson, or both, sold cocaine on April 7, 1978. It is the function of the jury to resolve conflicting evidence but in order to perform its function in this case, it was necessary for the jury to hear the testimony of the parties involved in the sale. It was important to the defense to have the jury hear the codefendant either answer questions or else claim her Fifth Amendment rights about her knowledge of the sale of the cocaine. Under Stewart v. State, supra, it was reversible error for the circuit court to refuse the request of Coleman to question Connie Thompson in the presence of the jury and have her either answer relevant questions or claim her Fifth Amendment rights.
Under the second assignment of error, Coleman contends the indictment failed to charge a crime. The indictment charged Coleman with the sale of cocaine in the following language: "Eric Coleman . . did wilfully, unlawfully and feloniously sell cocaine to L. Russell ..."
Coleman relies on Brewer v. State, 351 So.2d 535 (Miss. 1977) where we held an indictment charging the defendant with the delivery of a controlled substance was defective because of an omission of substance. The indictment named preludin as the controlled substance but preludin was not included in Schedule II of Controlled Substances. Section 41-29-115 Mississippi Code Annotated (Supp. 1976). The evidence in Brewer showed that preludin contains phenmetrazine which is a Schedule II controlled substance, but we held proof of that fact did not cure the defective indictment and the failure of the indictment to charge that preludin contained phenmetrazine was an omission of substance which could not be cured by proof.
We view Brewer as distinguishable from the present case for two reasons. First, cocaine, unlike preludin, has a well defined meaning. Preludin is a trade name but cocaine is a derivative of coca leaves. In Webster's Third New International Dictionary (1971) cocaine is defined as: "A bitter crystalline alkaloid ... obtained from coca leaves... ."
Second, cocaine is a derivative of coca leaves under section 41-29-115 Mississippi Code Annotated (Supp. 1977) which states in part:
The controlled substances listed in this section are included in Schedule II.
SCHEDULE II
(a) Any of the following substances, except those narcotic drugs listed in other schedules, whether produced directly or indirectly by extraction from substances of vegetable origin, or independently by means of chemical synthesis, or by combination of extraction and chemical synthesis:
(4) Coca leaves and any salt, compound, derivative, or preparation of coca leaves, and any salt, compound, derivative, isomer, or preparation thereof which is chemically equivalent or identical with any of these substances, but not including decocainized coca leaves or extractions which do not contain cocaine or ecgonine.
In Bishop v. State, 568 S.W.2d 136 (Tex. 1978) the Texas Court of Criminal Appeals addressed the same question. In that case Bishop argued that his indictment for delivery of cocaine failed to allege an offense because cocaine did not appear in the list of controlled substances. The applicable portion of the Texas Controlled Substances Act is identical to section 41-29-115(a)(4) Mississippi Code Annotated (Supp. 1977) except our statute contains the word isomer following the word derivative in (4). In construing the Texas statute, the court stated:

*160 Where this definition specifically includes any compound or derivative of coca leaves but excludes decocainized coca leaves or extractions which do not contain cocaine there is a necessary implication in the definition that cocaine is a derivative of or preparation from, coca leaves. This inference is strengthened by the prior provision of Article 725b, V.A.P.C. (1925) which was the predecessor of the Texas Controlled Substances Act where coca leaves were defined as including "cocaine and any compound, manufacture, salt, derivative, mixture, or preparation of coca leaves, except derivatives of coca leaves which do not contain cocaine ..." (568 S.W.2d at 137)
Mississippi's earlier drug statute, like the one in Texas, also stated that "`coca leaves' includes cocaine ..." Miss.Gen.Laws Ch. 289 § 2(11) (1936).
We adopt the interpretation of the statute made by the Texas Court and hold that an indictment charging the sale of cocaine is sufficient to charge the sale of a Schedule II controlled substance.
It is not necessary for us to consider the third assignment of error dealing with the quantum of proof because we are reversing and remanding this case for a new trial.
REVERSED AND REMANDED.
PATTERSON, C.J., SMITH and ROBERTSON, P. JJ., and WALKER, BROOM, LEE, BOWLING and COFER, JJ., concur.