# IN THE SUPREME COURT OF MISSISSIPPI
## NO. 1998-KA-01479-SCT

*LUKE T. WOODHAM a/k/a LUKE TIMS WOODHAM*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/12/1998 |
| TRIAL JUDGE: | HON. SAMAC S. RICHARDSON |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEY FOR APPELLANT: | LESLIE D. ROUSSELL |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: BILLY L. GORE |
| DISTRICT ATTORNEY: | RICHARD D. MITCHELL |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED-01/18/01 |
| MOTION FOR REHEARING FILED: | 1/29/2001; denied 3/22/2001 |
| MANDATE ISSUED: | 3/29/2001 |

**EN BANC.**

**McRAE, PRESIDING JUSTICE, FOR THE COURT:**

## STATEMENT OF THE CASE

¶1. In a judgment rendered on July 31, 1998, in the Circuit Court of Rankin County, Mississippi, Circuit Court Judge Samac Richardson ordered Luke T. Woodham to serve two life sentences for murder and one hundred and forty (140) years for convictions for aggravated assault on seven persons. Woodham filed a motion for judgment notwithstanding the verdict or a new trial on June 22, 1998, and this motion was denied by the lower court. From this order and conviction, Woodham brings this case before this Court, raising four issues concerning whether the trial court's erred in failing to allow Woodham complete examination of his witness Grant Boyette after Boyette invoked his Fifth Amendment right against self incrimination, whether sixteen year old Woodham's waiver of his *Miranda* rights was valid, whether the trial court erred in failing to give jury instructions on manslaughter and insanity, and whether the evidence of insanity was so overwhelming that the guilty verdict must be set aside.

¶2. Finding no reversible error, we affirm.

## STATEMENT OF THE FACTS

¶3. Luke Tims Woodham ("Woodham") was a student at Pearl High School who considered himself an outcast with very few friends. While attending Pearl, he met and began dating Christina Menefee

("Menefee"). When his relationship with Menefee ended, Woodham was upset and hurt, and he felt emotionally destroyed.

¶4. Shortly after his breakup with Menefee, Woodham became friends with Marshall Grant Boyette ("Boyette") and a group of other young men. This group discussed different subjects and began role-playing games, like Star Wars.

¶5. Boyette was a believer of Satanism, and he tried to induce Woodham to become a follower as well. Woodham stated Boyette told him that his "father," meaning Satan, had chosen Woodham to do great things for him. Woodham also said he had seen demons.

¶6. Woodham stated that Boyette would reiterate and emphasize the pain of his breakup with Menefee, saying that Woodham was worthless and spineless for not taking revenge on her. Finally, on the morning of October 1, 1997, Woodham killed his mother before going to school. He stated that he had been instructed what to do by Boyette, and that after killing his mother, he went to Pearl High School and shot and killed Menefee and Lydia Dew ("Dew"). Woodham also injured seven other students before leaving the school that day. Before escaping, Woodham was apprehended by assistant principal Joel Myrick ("Myrick"), who held him at gunpoint until the police arrived on the scene. Later that day, Woodham gave two confessions, one written and one videotaped, at the police department. Prior to the signed statement, he also signed and initialed a rights waiver form.

¶7. Woodham does not dispute that he killed his mother, Menefee, and Dew and injured seven other people. Woodham brings this appeal asserting four errors in the trial court.

## DISCUSSION

### I. WHETHER THE TRIAL COURT COMMITTED REVERSIBLE ERROR WHEN IT FAILED TO ALLOW THE DEFENDANT TO COMPLETE DIRECT EXAMINATION OF WITNESS GRANT BOYETTE.

¶8. Woodham asserts the trial court erred by not allowing him to question his witness, Grant Boyette, after he invoked his Fifth Amendment right against self-incrimination. In response to an initial question posed to Boyette by Woodham's attorney, Boyette read a statement informing the court that he would not answer any questions from the defense or the State. Boyette was then dismissed by the court as a witness. We affirm the ruling of the trial court.

¶9. Woodham relies on *Stewart v. State*, 355 So. 2d 94, 96 (Miss. 1978) and *Coleman v. State*, 388 So. 2d 157, 159 (Miss. 1980), stating that it is reversible error for the trial court not to allow a witness who has pled his Fifth Amendment to testify. Unlike the defendant in *Stewart* and *Coleman*, Boyette actually took the stand, and in the presence of the jury, invoked his privilege. Once a witness has claimed his constitutional right against self-incrimination, he is protected from further questioning by the trial court. See *Williamson v. State*, 512 So. 2d 868, 872 (Miss. 1987), *impliedly overruled on other grounds by Hansen v. State,* 592 So. 2d 114, 134 (Miss. 1991); *Boring v. State*, 253 So. 2d 251, 256 (Miss. 1971). *See also Butler v. State*, 702 So. 2d 125, 128 (Miss. 1997) (holding it was not reversible error for a court to prevent a co-indictee from testifying after he invoked his Fifth Amendment right, even when the co-indictee's testimony was vital to the defendant's case).

¶10. It was not reversible error for the trial court to refuse to permit Woodham to continue to question

Boyette after he had invoked his Fifth Amendment right. Boyette did not discriminate as to which questions he would or would not answer. Questioning Boyette further would have provided little help to the jury in determining fact issues. Furthermore, from an initial question to Boyette, "Mr. Boyette, you run around with younger kids to control them, don't you?", it can be inferred that Boyette might have incriminated himself had he been forced to testify. Therefore, to permit these questions would be contrary to the very purpose of the Fifth Amendment privilege. This issue is without merit.

### II. WHETHER THE DEFENDANT WAS DENIED DUE PROCESS OF LAW WHEN THE TRIAL COURT DETERMINED THAT HIS WAIVER OF MIRANDA RIGHTS WAS VALID.

¶11. Woodham asserts that his confessions should not have been admitted into evidence because the two confessions were not voluntarily given. Woodham states on appeal that he was too young to comprehend his rights or a waiver of his rights. At trial, Woodham objected to the admission of his confessions during the testimony of Officer Aaron Hirschfield, on the ground that Woodham did not have an attorney present at the time these confessions were given. We find the trial court did not err by admitting Woodham's two confessions.

¶12. Asserting grounds for an objection on appeal that differs from the ground given for the objection at the trial level does not properly preserve the objection for appellate review. *Paracelsus Health Care Corp. v. Willard*, 754 So. 2d 437, 441 (Miss. 1999)(citing **Ballenger v. State**, 667 So. 2d 1242, 1264 (Miss. 1995)); *see also **Jones v. State***, 606 So. 2d 1051, 1058 (Miss. 1992). Therefore, Woodham's appeal of this objection is procedurally barred.

¶13. Even if Woodham's argument were not procedurally barred, his objection to the admission of these confessions would be without merit because age alone is not the deciding factor in determining the admissibility of a confession of a minor. The Supreme Court has stated that a "totality of the circumstances" approach should be used in determining the defendant knowingly and intelligently waived his *Miranda* rights. This approach should be used in determining the admissibility of confessions, whether they come from minors or adults. *Fare v. Michael C.*, 442 U.S. 707, 725, 99 S.Ct. 2560, 2572, 61 L.Ed.2d 197 (1979).

¶14. The *Fare* Court stated that the totality of the circumstances test provides greater flexibility to the trial court in determining the admissibility of confessions from juveniles by taking into consideration the age and experience of the child. For example, a minor may have had a significant amount of experience with the court system and knowledge of his legal rights, while another may have no experience at all. *See also **In re Interest of W.R.A.***, 481 So. 2d 280, 285-86 (Miss. 1985). The age of the minor is seldom per se conclusive in deciding whether a confession was freely and voluntarily given. *Id.* at 286.

¶15. On appeal, Woodham does not assert that he was threatened, coerced, or forced to give his two confessions. Three law enforcement officials testified that Woodham was calm and willing to give his confessions. The record reflects that Woodham was Mirandized at least three times on the morning of October 1. Woodham was given his *Miranda* warnings by the arresting officer, Roy Dampier; by Officer Hirschfield when he was driving him to the police department; and a third time at the police department by Officer Hirschfield. These two officers, as well as Officer Dustin Bairfield in the presence of Officer Dampier, asked Woodham if he understood his rights, and each time Woodham responded that he did understand. The three officers described Woodham's demeanor at the time of his arrest and detention as

"very calm and observant," "calm and in control," and "calm...real calm."

¶16. After arriving at the police department, Hirschfield gave Woodham a copy of a rights waiver form, which contained a standard *Miranda* warning. The officer also had a copy of this form and testified that he read aloud as Woodham followed along. Hirschfield stated that Woodham indicated he understood his rights, and Woodham also marked and initialed two blanks on the form, one affirming that he understood his rights and the other indicating that he wished to give a statement at that time. Woodham signed this rights waiver form, and also proceeded to give a videotaped confession.

¶17. Although Woodham was only 16 on the day of the shooting, it is evident from the record that Woodham was very articulate and poised for a boy of his age. On direct examination, Woodham described in detail his feelings of anger and revenge against his former girlfriend. He recalled meeting Boyette for the first time. When Boyette gave him a piece of paper with a pentagram on it, Woodham recognized the symbol and referred to it as a pentagram. Woodham described an incident that occurred prior to meeting Boyette, when he and a friend bought a book entitled, *Necronomican*, and described in detail how he and his friend attempted to perform spells from this book.

¶18. Woodham was able to articulately describe his feelings and emotions. On direct examination, he stated, "Well, I mean, in one second I was some kind of a heartbroken idiot and then the next I felt like I had complete control or complete power over a lot of things....I mean I went from failing the ninth grade to a few months later reading books on astrophysics ...."

¶19. Woodham may be young, but his articulate testimony and the number of times he was read his *Miranda* rights by the law enforcement officers, indicate that Woodham had no trouble understanding and waiving his *Miranda* rights on the day in question. Under the totality of the circumstances approach mandated by *Fare* and ***W.R.A.*** the record indicates Woodham understood his right against self-incrimination and the consequences of waiving this right. Woodham also did not object to the admissibility of these confessions prior to this testimony, which would have entitled him to a hearing outside the presence of the jury and an opportunity for the trial judge to determine the admissibility of these statements.

¶20. Woodham is procedurally barred on this issue and the trial court did not err in admitting Woodham's two confessions.

### III. WHETHER THE COURT COMMITTED REVERSIBLE ERROR BY REFUSING TO GRANT PROPOSED JURY INSTRUCTIONS DEALING WITH MANSLAUGHTER AND INSANITY.

¶21. Woodham asserts that the trial court erred by not granting his proposed jury instructions D-5, D-6, D-9, D-10 and D-11. Instructions D-9 and D-10 are forms for the verdict of manslaughter. Instructions D-5 and D-6 were instructions concerning the elements of manslaughter, and D-11 was an insanity instruction.

¶22. As articulated by the State, instruction D-11 is contradictory and confusing, and this jury instruction was properly excluded. The instruction first asks the jury to determine whether the State proved Woodham sane, while the second and third paragraphs lists the elements of insanity that the State must prove to find him insane. The jury was instructed as to the definition and elements of insanity in Mississippi by other jury instructions. This instruction was properly denied.

¶23. As to instructions D-5 and D-6 for manslaughter and the accompanying verdict form proposed

instructions, D-9 and D-10, the trial court has the discretion to refuse these instructions if the evidence does not support giving these instructions to the jury.

¶24. The standard of review for challenges to jury instructions is that the instructions are to be read together as a whole, with no one instruction to be read alone or taken out of context. A defendant is entitled to have jury instructions given which present his theory of the case. However, the trial judge may also properly refuse these instructions if he finds them to incorrectly state the law or to repeat a theory fairly covered in another instruction or to be without proper foundation in the evidence of the case. *Humphrey v. State*, 759 So. 2d 368, 380 (Miss. 2000) (citing **Heidel v. State**, 587 So. 2d 835, 842 (Miss. 1991) (citations omitted)).

¶25. Instructions D-5, D-6, D-9, and D-10 failed under the standard of review as set forth by *Humphrey*. These proposed jury instructions do not properly state the law, and they did not have a proper evidentiary foundation in the facts of the present case. Woodham talked to Boyette for several hours the night before the shooting and on the morning of the shooting. Woodham stated during his testimony that, on that morning, "I had been instructed pretty much what to do by Grant."

¶26. For the above reasons, the trial court did not err in refusing Woodham's proposed jury instructions concerning manslaughter and the insanity defense. The trial judge properly refused the proposed instructions D-5, D-6, D-9, and D-10 on the grounds that they were not supported by the evidence and D-11 in that it did not properly state the law.

### IV. WHETHER THE EVIDENCE OF THE DEFENDANT'S LEGAL INSANITY WAS SO GREAT THAT ANY REASONABLE JURY COULD NOT HAVE FOUND THE DEFENDANT SANE BEYOND A REASONABLE DOUBT.

¶27. Mississippi still follows the *M'Naghten* test for determining a person's sanity at the time of the crime. *Russell v. State*, 729 So. 2d 781, 784 (Miss. 1997) (citing **Westbrook v. State**, 658 So. 2d 847, 850 (Miss. 1995); **Tyler v. State**, 618 So. 2d 1306, 1309 (Miss. 1993); **Roundtree v. State**, 568 So. 2d 1173, 1181 (Miss. 1990); **Davis v. State**, 551 So. 2d 165, 173 (Miss. 1989)). Under the *M'Naghten* test, it must be proved that at the time of committing the act that the accused "was laboring under such defect of reason from disease of the mind as (1) not to know the nature and quality of the act he was doing or (2) if he did know it, that he did not know that what he was doing was wrong. **Roundtree**, 568 So. 2d at 1181 (citations omitted). Essentially, the test is whether the accused did not know right from wrong at the time of committing the act. *Russell*, 729 So. 2d at 784 (citing **Roundtree**, 568 So. 2d at 1181)).

¶28. Both Woodham and the State offered experts in forensic psychology and psychiatry to testify to Woodham's state of mind at the time of the shooting. The State points to several incidents demonstrating Woodham's ability to differentiate between right and wrong. For example, Woodham stated on cross-examination that he knew what he was doing at the high school was wrong and that he did not want to do it, made a written statement that he spared the life of Jerry Safely because Jerry had not been mean to him, and apologized to Jerry during the course of his shooting spree because he thought he was someone else.

¶29. The jury heard both sides of the issue and determined that Woodham was not insane at the time of the shooting. The issue of a defendant's sanity is an issue for the jury to determine, and its finding will not be reversed if it is supported by substantial evidence. **Davis v. State**, 551 So. 2d at 173 (citing **Yarbrough v. State**, 528 So. 2d 1130 (Miss. 1988); **Gerlach v. State**, 466 So. 2d 75,79 (Miss. 1985); **Brady v.**

*State*, 425 So. 2d 1347, 1349 (Miss. 1983)). It is in the jury's discretion to accept or reject any expert testimony. *Davis*, 551 So. 2d at 174 (citing *Gill v. State*, 488 So. 2d 801, 802 (Miss. 1986); *Brady*, 425 So. 2d at 1349)).

¶30. The jury heard the expert testimony offered by Woodham and the State, and it found Woodham not to be insane under the *M'Naghten* test. The verdict of the jury should not be overturned.

## CONCLUSION

¶31. Finding no reversible error by the trial court, we affirm its judgment.

¶32. **CONVICTION OF TWO (2) COUNTS OF MURDER AND SENTENCE OF LIFE IMPRISONMENT FOR EACH COUNT, AFFIRMED.**

**CONVICTION OF SEVEN COUNTS OF AGGRAVATED ASSAULT AND SENTENCE OF TWENTY YEARS FOR EACH COUNT, FOR A TOTAL OF TWO LIFE SENTENCES AND ONE HUNDRED FORTY (140) YEARS TO SERVE, AFFIRMED. EACH OF THESE SENTENCES ARE TO RUN CONSECUTIVELY TO EACH OTHER, AND CONSECUTIVE TO THE LIFE SENTENCE IMPOSED IN NESHOBA COUNTY CAUSE NO. 8696, FOR A TOTAL OF THREE (3) LIFE SENTENCES AND ONE HUNDRED FORTY (140) YEARS TO SERVE, AND TO PAY RESTITUTION TO THE VICTIMS AND ALL OTHER CONDITIONS AND COSTS, AFFIRMED.**

**PITTMAN, C.J., BANKS, P.J., SMITH, MILLS, WALLER, COBB AND DIAZ, JJ., CONCUR. EASLEY, J., NOT PARTICIPATING.**