976 So.2d 932 (2007)
Christopher D. FAIR, Appellant
v.
STATE of Mississippi, Appellee.
No. 2005-KA-02216-COA.
Court of Appeals of Mississippi.
August 7, 2007.
Rehearing Denied November 27, 2007.
Raymond M. Baum, Winona, attorney for appellant.
Office of the Attorney General by John R. Henry, attorney for appellee.
Before KING, C.J., IRVING and ROBERTS, JJ.
IRVING, J., for the Court.
¶ 1. Christopher Fair was convicted of capital murder by a jury and was sentenced by the Choctaw County Circuit Court to a term of life in the custody of the Mississippi Department of Corrections *933 without the possibility of parole. Aggrieved, Fair appeals his conviction, and presents three issues for appeal: whether his confession should have been suppressed, whether the jury should have been given a manslaughter instruction, and whether cumulative errors demand the reversal of his case.
¶ 2. Finding no error, we affirm.

FACTS
¶ 3. On February 4, 2005, Fair, who was sixteen at the time, was driving a car[1] in Ackerman, Mississippi, with three passengers, when he was pulled over by police for various minor infractions.[2] As the officer attempted to approach Fair's vehicle, the vehicle sped away. That officer, as well as another officer who had observed the failed stop, began to pursue Fair.
¶ 3. The officers pursued Fair at speeds that got up to around eighty miles per hour, and multiple law enforcement officers joined the pursuit. The police set up roadblocks, but were unable to stop Fair. At one of these roadblocks, an officer fired a shotgun at the car in an attempt to stop it, but missed the car entirely. Fair eventually arrived at his home, with the officers in close pursuit. Fair and another passenger, Sylveeta Miller, exited the vehicle and ran inside Fair's house, while the other two occupants of the vehicle ran around the house. Two officers, James Turner and Anthony Lucas, followed Fair and Miller into the house. Turner was a deputy with the Choctaw County Sheriff's Department, and Lucas was a Mississippi Department of Corrections probation officer and part-time French Camp, Mississippi, chief of police. Turner and Lucas pursued Miller, who ran into the back of the house where she attempted to open a door and flee the house. As Turner was attempting to secure Miller, he heard a gunshot and heard something drop to the floor.
¶ 4. When Turner turned around, he found Lucas on the floor. When Turner attempted to check on Lucas's condition, he realized that Lucas had been severely injured. As he testified: "And I am pulling on him, hollering and screaming trying to get some response from him. When I pull on him trying to get him to get up, the blood just poured out from under him on the floor." Lucas's autopsy revealed that he had died from a shotgun wound to the head. At the time of the shooting, Turner noticed that there was a shotgun on the floor near Lucas, and he picked it up because he was "outnumbered in the house. . . ." Turner then took the gun outside and secured it in his vehicle. Turner testified that he did not see Fair when the shot went off but that he later observed Fair "jumping around, hollering, screaming, out of control." Thereafter, Turner and other officers worked to contain the crime scene, and Fair fled into the woods surrounding his house. Fair turned himself in at a roadblock around three in the morning and was taken into custody.
¶ 5. Fair was taken to the Choctaw County Justice Court Complex for questioning. At that time and several times prior, Fair was informed of his Miranda rights. Fair was questioned around five in the morning, at which time he admitted that he had shot Lucas. Fair told the officers that he made the decision to shoot *934 a police officer while he and his companions were fleeing in the car from the traffic stop. Fair said that he decided to shoot a police officer because he "got tired of them foolin' with me." Fair stated that he knew Lucas was a police officer because of his uniform but admitted that he did not know when he shot Lucas whether Lucas had ever bothered him. Clay Bane, one of the officers who questioned Fair, testified that Fair was given the opportunity to explain why he had shot Lucas, and the only explanation he gave was that he was tired of the officers bothering him. Bane testified that Fair told him during the interview that Charlie Pittman was the officer that stopped Fair all the time, but Pittman was never involved in the events of February 4, 2005.
¶ 6. Additional facts will be related, as necessary, during our analysis and discussion of the issues.

ANALYSIS AND DISCUSSION OF THE ISSUES

1. Suppression of Confession
¶ 8. Fair contends that his confession should have been suppressed because of his age, mental retardation, mental problems, and lack of understanding as to the rights he was waiving before he confessed. Specifically, Fair contends that given that he was "a 16 year old with a history of mental retardation and psychiatric problems, and the early morning hours when the statement was obtained, and the testimony of a child psychiatrist who had treated this individual the trial court should not have found . . . that this was a free and voluntary act." Fair argues that, under the totality of the circumstances, his confession was not voluntarily given. We have a narrow scope of review when reviewing a court's admission of a confession, and "we will not overturn a finding of fact made by a trial judge unless it be clearly erroneous or contrary to the overwhelming weight of the evidence. Where, on conflicting evidence, the lower court admits a statement into evidence [we] generally must affirm." Miller v. State, 740 So.2d 858, 867(134) (Miss.1999) (quoting Dancer v. State, 721 So.2d 583, 587(¶ 18) (Miss. 1998)).
¶ 9. There are several factors at work in this case. First, Fair was only sixteen years old when he gave his confession, and he did so without the presence of his parents or an attorney. Second, there was significant evidence that Fair is mildly retarded, although that evidence was strongly debated below. Finally, Fair gave his confession in the early hours of the morning, after having fled from police and having been through what possibly were traumatic experiences. All of these circumstances must be viewed together to determine whether the court erred in ruling that Fair's confession was knowingly and voluntarily given. See McGowan v. State, 706 So.2d 231, 235(¶ 13) (Miss.1997).
¶ 10. The State and Fair both presented expert psychological testimony at the suppression hearing below. Dr. Caroline Tingle, a child psychiatrist who had treated Fair before the incidents leading to his arrest, testified that Fair would be able to understand his rights if they were read to him slowly and if he were given the chance to ask questions about them. Tingle testified that Fair's overall I.Q. had been tested as 55 in February of 2003, although the test had been run by someone else. During voir dire examination regarding Dr. Tingle's qualification as an expert, she admitted that she had never been asked to make an evaluation as to Fair's "competency to waive and understand his rights by a court." As to Fair's mental capability, Dr. Tingle testified that Fair was "somewhere in the ballpark of mildly mentally retarded to borderline intellectual functioning." Dr. *935 Tingle testified that the I.Q. test that had found Fair's I.Q. to be 55 was "more consistent with mild retardation than with borderline. I have seen other reports with a higher verbal I.Q. on [Fair]."
¶ 11. Dr. Tingle testified that Fair's ability to waive his rights would be affected by his young age, possibly by his mild retardation, by Fair's diagnosis of attention deficit disorder, and by the fact that Fair had been up all night before he gave his statement. Dr. Tingle clarified that she was not sure that the last would be true for Fair, as his sleep cycles may already have been "off": "I had read something in Dr. McMichael's report about he sleeps during the day and is up at night. That is the only part of it  I don't know when he started doing that." Dr. Tingle was asked whether the shot that was fired at Fair's vehicle could have caused him to suffer from posttraumatic stress disorder, and Dr. Tingle stated that it hypothetically could: "Just a hypothetical, the answer is yes. I would be hesitant to go way out on that limb though, you know, because I didn't see [Fair] that night. I don't know that he was suffering from any posttraumatic stress."
¶ 12. When asked directly by Fair's attorney, "Dr. Tingle, based on your past experience with treating and diagnosing Christopher Fair . . . in taking the totality of the circumstance [sic] into consideration . . . would you be concerned that he really understood what he was doing when he gave his statement in terms of knowing what he was doing," Dr. Tingle responded, "You know, I just don't know. Certainly you would have concerns. You would want to make sure it was done properly." Dr. Tingle explained: "I don't think he could grasp it quickly. Maybe if it were done slowly, repeatedly and he was given an opportunity to ask questions. And he has also had some legal contact before so he may know some things." During cross-examination, when asked whether she had any reason to doubt the conclusions reached by the doctors who examined Fair's competency after the shooting, Dr. Tingle stated: "I certainly have great respect for both of them. All I can say is I don't know. I don't know if he did or not." (emphasis added). Dr. Tingle testified further during cross-examination that she had most recently treated Fair in February of 2004, and that the majority of her time spent treating Fair was in 1998, seven years prior to trial.
¶ 13. Dr. Reb McMichael, the psychiatrist who was ordered by the court to evaluate Fair's competency to give his statement, testified that Fair was competent to waive his rights. Dr. McMichael stated that nothing he had heard in the suppression hearing had changed his opinion of Fair's competency. When asked about Dr. Tingle's opinion and conclusions, Dr. McMichael gave the following answer:
When Dr. Tingle was treating [Fair] seven or eight years ago nobody asked her whether he was competent to waive or assert his right not to incriminate himself. She didn't evaluate him for that. As far as I know, she has never evaluated anybody for that.
So if the question is, is Dr. Tingle more familiar with Mr. Fair clinically, the answer to that is correct. Yes, she is. If the question is, is she in a better position because of that to assist the Court in determining whether or not he can waive his constitutional rights, the answer to that is no, she is not.
She did not have access to all of the information that we had and I think this is an important distinction. Carol Tingle saw Mr. Fair as his therapist and physician for over a year. If she's not sympathetic with him, she is in the wrong job. She was his doctor. I was *936 not his doctor. I was his forensic evaluator. So I think I'm in a better position to assist the Court in answering the question that is my understanding is before us.
Dr. McMichael further testified that Fair tested at a 61 on his full scale I.Q. test at the state hospital, but that "we did not think [that] accurately represented his intellectual ability." Dr. McMichael explained: "According to the individual who was doing the testing, Mr. Fair did not put forth much effort on the testing and there were times when he was malingering, i.e., faking." When asked about Fair's level of mental retardation, Dr. McMichael stated:
Well, again my memory is that in the testing I reviewed, at least on one occasion he scored as high as a 75. It is my understanding that while it is easy to fake dumb on intelligence testing, it is not possible to fake smart. So if the testing is accurate, I would assume that his I.Q. is at least 75.
Clinically, with all the clinical information that I reviewed and interviewing Mr. Fair and paying attention to his language usage and paying attention to his language usage in the transcript of his statement from the 5th of February, I would estimate that he is in the borderline range of intellectual functioning.
I could not say definitively that he is not mildly, mentally retarded. If he is mentally retarded at all, he is in the very upper range of mild mental retardation. And I think he is not retarded and in the borderline range of intellectual functioning.
Dr. McMichael agreed with Dr. Tingle's assessment to the degree that he admitted that it would have been preferable to question Fair when he was well-rested and after each of his rights had been carefully gone over, with some opportunity for Fair to ask questions. Dr. McMichael also agreed that a youth of Fair's age would have more difficulty understanding his rights than an adult would. Dr. McMichael stated that his opinion of Fair's competency to waive his rights was the same as that of the second doctor who helped evaluate Fair after the shooting.
¶ 14. In Woodham v. State, 800 So.2d 1148, 1154 (¶ 17) (Miss.2001), the Mississippi Supreme Court noted that the totality of the circumstances test must be used when examining a juvenile's confession because "[t]he age of the minor is seldom per se conclusive in deciding whether a confession was freely and voluntarily given." (quoting Woodham v. State, 779 So.2d 158, 161(¶ 14) (Miss.2001)). The Woodham court noted that "[a]lthough Woodham was sixteen with no prior experience with the authorities, the record reflects he was Mirandized at least three times on the morning. . . ." Id. The court also noted that, although Woodham was sixteen and had no prior law experience, he appeared to be of above average intelligence: "Woodham was not a person of low intellectual abilities. In his descriptions to the jury, he explained how he enjoyed reading philosophical works, such as Nietzsche, Aristotle, and Plato as well as classic literature by Dostoyevsky. He also conveyed his thoughts in several writings, including poetry and songs. . . ." Id. at 1154-55 (¶ 18).
¶ 15. Like Woodham, Fair was sixteen at the time of the shooting and his subsequent questioning. Unlike Woodham, Fair had had previous experiences with law enforcement. His own expert, Dr. Tingle, opined that these experiences may have impacted his ability to understand his rights. Furthermore, the record reflects that Fair was advised of his rights multiple times by various law enforcement officers. All the officers who testified at the suppression hearing testified that Fair appeared to understand his rights as they *937 were read to him. The doctors who examined him in regard to his competency also found that he understood his rights as they were read to him prior to his confession. The evidence was conflicted as to how mentally handicapped, if at all, Fair was. Some tests apparently indicated that Fair was mildly mentally retarded, while other tests showed him as only borderline retarded.
¶ 16. In McGowan v. State, 706 So.2d 231, 237-38 (¶¶ 28-30) (Miss.1997), the Mississippi Supreme Court addressed the admissibility of statements made by a seventeen-year-old capital murder defendant whose most recent I.Q. test, taken several years before the incident, revealed that he had an I.Q. of 55. Despite a lack of expert testimony as to McGowan's mental capability, the court found that there was no error in the admission of McGowan's statements. Id. at 238 (¶¶ 31-32). Citing McGowan, the Mississippi Supreme Court in Dancer, 721 So.2d at 586-89 (¶¶ 11-27) upheld the admission of statements made by a thirteen-year-old who claimed that he was mentally handicapped. Unlike McGowan and Fair, Dancer's I.Q. had never been tested, and all his evidence regarding any mental defect came solely from his scores on standardized tests and from school grades. Id. at 588-89 (¶¶ 24-27).
¶ 17. Under the totality of the circumstances, we cannot find that the court erred in admitting Fair's confession. Dr. McMichael testified that the state hospital's forensic examination of Fair's competency led him and his peers to believe that Fair was competent to waive his rights prior to confessing, and that he understood the import of that waiver. Dr. Tingle did not testify that Fair could never understand his rights, and she emphasized that she did not examine Fair after his confession, as did Dr. McMichael. Dr. Tingle knew Fair only as a patient she treated, rather than in a forensic capacity. Furthermore, multiple officers testified that they either read Fair his rights or were present when another officer read those rights. All the officers indicated that Fair appeared to understand his rights, and nothing was presented to indicate that Fair had questions about his rights that went unanswered.
¶ 18. The decision of the court to admit Fair's confession was neither "clearly erroneous or contrary to the overwhelming weight of the evidence." This contention of error is without merit.
2. Manslaughter Instruction
¶ 19. Fair contends that the court erred when it refused to grant him a lesser-included offense instruction on manslaughter. "Lesser included offense instructions should be given if there is an evidentiary basis in the record that would permit a jury rationally to find the defendant guilty of the lesser offense and to acquit him of the greater offense." Sanders v. State, 781 So.2d 114, 119(¶ 16) (Miss. 2001) (quoting Welch v. State, 566 So.2d 680, 684 (Miss.1990)). The Sanders court also indicated that:
A lesser-included offense instruction should be granted unless the trial judge and ultimately this Court can say, taking the evidence in the light most favorable to the accused and considering all the reasonable inferences which may be drawn in favor of the accused from the evidence, that no reasonable jury could find the defendant guilty of the lesser-included offense ([and] conversely, not guilty of at least one element of the principal charge).
Id. (quoting McGowan v. State, 541 So.2d 1027, 1028 (Miss.1989)). The Sanders court cautioned that "a lesser-included offense instruction should not be indiscriminately granted, but rather should be submitted *938 to the jury only where there is an evidentiary basis in the record." Id. (citing Lee v. State, 469 So.2d 1225, 1230 (Miss.1985)).
¶ 20. Fair proposed several instructions related to manslaughter. Proposed instruction D-2 reads: "The Court instructs the jury that the killing of a human being, without deliberation, in the heat of passion, by the use of a dangerous weapon without authority of law and not in necessary self-defense, either real or apparent, is manslaughter." Proposed instruction D-4 reads in relevant part: "The crime of manslaughter is distinguished from murder by the absence or failure to prove that the defendant acted with the necessary deliberation." Proposed instruction D-11 reads:
The Court instructs the jury that one of the elements of the offense of capital murder which the prosecution must prove beyond a reasonable doubt is that the defendant acted with deliberation.
"Deliberation" involves consideration and reflections upon the preconceived design to kill; turning it over in the mind; giving it a second thought. The mental process of deliberating requires that an appreciable time elapse between formation of the plan to kill and the fatal act.
Any killing of a human being, even though intentional but not excusable or justifiable on other grounds as the Court has instructed you, committed on impulse or in sudden passion and without deliberation becomes manslaughter.
Proposed instruction D-12 further attempted to define manslaughter for the jury:
The Court instructs the jury that heat of passion is defined as a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
¶ 21. Mississippi Code Annotated section 97-3-35 (Rev.2000) states: "The killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense, shall be manslaughter." The Mississippi Supreme Court has defined "heat of passion" as
a state of violent and uncontrollable rage engendered by a blow or certain other provocation given, which will reduce a homicide from the grade of murder to that of manslaughter. Passion or anger suddenly aroused at the time by some immediate and reasonable provocation, by words or acts of one at the time. The term includes an emotional state of mind characterized by anger, rage, hatred, furious resentment or terror.
Simmons v. State, 805 So.2d 452, 473(¶ 31) (Miss.2001) (quoting Tait v. State, 669 So.2d 85, 89 (Miss.1996)).
¶ 22. Here, there is no evidentiary basis in the record for a manslaughter instruction. Fair stated in his confession to police that he formed the intent to shoot Lucas while he was fleeing police. Fair contends that his theory of the case was that he acted in the heat of passion "because of the fact that just minutes before [he] shot Anthony Lucas he had himself been shot at, and then minutes later armed intruders representing Choctaw County law enforcement stormed into his house." However, nothing in the record indicates that Fair was frightened or startled when he shot and killed Lucas. When given the *939 chance to explain why he shot Lucas, Fair mentioned nothing about being frightened or traumatized by the police chase. Instead, Fair maintained in his confession that he decided to shoot an officer because he was tired of the officers bothering him. Fair admitted that he formed this intent while he was fleeing from the site of the attempted traffic stop.
¶ 23. There is no evidentiary basis for a manslaughter instruction in the record. The arguments of counsel as to what Fair may or may not have felt at the time are irrelevant.[3] There is nothing to indicate that Fair was frightened or that he acted in the heat of passion when he shot and killed Lucas, and Fair's own statements to police indicated that he did not act in the heat of passion but rather acted deliberately in shooting Lucas. This contention is without merit.

3. Cumulative Error
¶ 24. As we have found no error in any part, we find no cumulative error that demands reversal. Wilson v. State, 936 So.2d 357, 365(¶ 24) (Miss.2006). Fair is entitled to a fair trial, but not a perfect one. Id. Nothing in the record indicates that Fair did not receive a fair trial, and this contention is also without merit.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF CHOCTAW COUNTY OF CONVICTION OF CAPITAL MURDER AND SENTENCE OF A TERM OF LIFE IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITHOUT THE POSSIBILITY OF PAROLE, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO CHOCTAW COUNTY.
KING, C.J., LEE AND MYERS, P.JJ., CHANDLER, GRIFFIS, BARNES, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR.
NOTES
[1] Whether Fair was driving the vehicle or was a passenger in the vehicle was contested below. The State's witnesses contended that Fair was driving the vehicle. The defense contended that Fair's brother was driving the vehicle and that Fair was a passenger.
[2] The car allegedly had only one functioning headlight and had at least one non-functioning tail light.
[3] For example, Fair's appeal brief states that "a jury could have found . . . that the deefnant [sic], after being shot at and having his home invaded by armed intruders, albeit with badges, became enraged to the point where he lost the reason he possessed and for this reason took a life." However, this interpretation of the events is belied by Fair's confession, where, as we have already discussed, he mentions nothing about killing Lucas because he was angry or upset because of the chase or the intrusion into his home.