# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-KA-01332-SCT

*DOUGLAS WALTERS a/k/a DOUGLAS HOWARD WALTERS*

*v.*

*STATE OF MISSISSIPPI*

| | |
|---|---|
| DATE OF JUDGMENT: | 06/11/2015 |
| TRIAL JUDGE: | HON. JOHN HUEY EMFINGER |
| TRIAL COURT ATTORNEYS: | DEWEY ARTHUR |
| | LEE WILKINS |
| | EDWARD RAINER |
| | GARY WILLIAMS |
| COURT FROM WHICH APPEALED: | RANKIN COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE STATE PUBLIC |
| | DEFENDER |
| | BY: JUSTIN T. COOK |
| | DOUGLAS WALTERS (PRO SE) |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JEFFREY A. KLINGFUSS |
| DISTRICT ATTORNEY: | MICHAEL GUEST |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 12/01/2016 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**EN BANC.**

**WALLER, CHIEF JUSTICE, FOR THE COURT:**

¶1.     A Rankin County jury found Douglas Walters guilty of grand larceny, and he was sentenced to serve ten years in the custody of the Mississippi Department of Corrections. Walters now appeals to this Court, arguing that the trial court erred in its application of the

grand-larceny statute, in quashing a codefendant's subpoena, and in admitting unauthenticated hearsay into evidence. Finding no error, we affirm.

## FACTS & PROCEDURAL HISTORY

¶2. On the morning of February 9, 2012, Robert Nelson drove to his construction company's 140-acre property located off Highway 471 in Brandon, Mississippi. Nelson's company specializes in building roads and bridges, and he uses this property to store construction equipment and materials. Upon arriving at the property, Nelson noticed that the chain securing the front gate had been cut, and a padlock had been attached to the chain in place of the combination lock that normally held it in place. Nelson drove onto the property to investigate. Near the back of the property, Nelson observed a man carrying one of his company's concrete hoppers with a forklift.[1] Nelson did not recognize the man, so he called the police.

¶3. Bradley Turner with the Brandon Police Department responded to Nelson's property at around 8:00 a.m. Turner identified the man on Nelson's property as Arnold Bailey, and he determined that the forklift had been rented from McGraw Rental & Supply in Ridgeland by Douglas Walters. Later that afternoon, Turner met Walters at Nelson's property so that Walters could retrieve the forklift and return it to McGraw Rental. Turner did not make any arrests at that time.

¶4. Nelson reported to Turner that about 150 pieces of heavy-duty steel scaffolding, along with some other materials, were missing from his property. In an effort to locate the missing

---

[1] Some witnesses referred to the forklift as a skid-steer loader.

scaffolding, Turner visited some local recycling mills. Turner located two scale-ticket receipts indicating that Walters had delivered scrap metal to General Recycling in Flowood on February 8 and 9, 2012. Turner obtained a photograph of the February 9 delivery, which depicted Walters's truck pulling a trailer full of metal scaffolding.

¶5.     On May 2, 2013, Walters and Bailey were indicted for one count of grand larceny, in violation of Section 97-17-41 of the Mississippi Code. The indictment alleged that, on or about February 9, 2012, Walters and Bailey unlawfully took, stole, and carried away steel scaffolding belonging to Nelson and having a value of $500 or more, with the intent to permanently deprive Nelson of this property.[2] Walters and Bailey were tried separately.

¶6.     Shortly after Walters's first trial commenced, the State discovered photographic evidence with possible exculpatory value to Walters. Accordingly, the trial court declared a mistrial and allowed Walters to review this evidence. Walters's second trial also ended in a mistrial, as the jury was unable to reach a verdict after lengthy deliberations. Walters's third and final trial commenced on June 9, 2015.

¶7.     At trial, Nelson testified that the type of scaffolding he uses in his business is not common because it typically is used in heavy construction projects. He estimated that each piece of scaffolding was worth about $65. During Nelson's testimony, the State introduced

---

[2] The original indictment charged Walters and Bailey with stealing some additional property, including steel beams, aluminum plates, a shop fan, steel tubes, a concrete hopper, and fifty-gallon steel drums. The original indictment also included the specific number of items stolen. Prior to trial, the State moved to amend the indictment to remove the additional items, as well as the total number of items stolen, so that Walters and Bailey were charged with stealing just the steel scaffolding. The indictment later was amended to change the date of the offense from February 8, 2012, to February 9, 2012. Walters does not challenge the amendment of his indictment on appeal.

into evidence a piece of scaffolding owned by Nelson. Nelson testified that this scaffolding looked identical to the scaffolding in the photograph retrieved from General Recycling. On cross-examination, Nelson admitted that his scaffolding did not have any unique identifying marks and that about fifteen people knew the combination to the lock on the front gate of his property.

¶8. Steve Lambright testified that he worked as the scale master for General Recycling, and that he was working the scales on February 9, 2012, when Walters delivered a load of steel scaffolding. Lambright knew Walters as a regular customer of General Recycling. He also explained that General Recycling tracks its customers' transactional information electronically and stores photographs of every transaction. The scale ticket for the February 9 delivery indicated that Walters had delivered 6,880 pounds of metal at 8:27 a.m. and was paid $722.40. The scale ticket and photographs of this transaction were admitted into evidence.

¶9. Walters's defense at trial was that he owned the materials that he sold to General Recycling on February 9, 2012. He claimed that these materials had been used to build a house on his property in Brandon, but that he had decided to sell the materials after the house burned down. The State called Bo Edgington with the Brandon Police Department to challenge this defense. Edgington had responded to a house fire at Walters's property on October 10, 2010. Edgington had taken numerous photographs of the property as the fire department raked through the debris. Edgington's photographs were admitted into evidence. Edgington testified that he observed some metal scaffolding in the debris on Walters's

property; however, this scaffolding did not look similar to the scaffolding depicted in the photographs retrieved from General Recycling.

¶10. Russell Humphreys testified as an expert witness for the State. He was accepted by the trial court as an expert in the area of "price and identification of scaffolding." Humphreys worked as the manager of Direct Scaffold Services in Pearl, Mississippi, a company that sells and rents scaffolding to contractors. Humphreys had worked for Direct Scaffold Services for fifteen years at the time of trial and had an additional four years of experience with another company. Humphreys identified the type of scaffolding depicted in the photographs taken at General Recycling as a "shoring frame," which is used primarily for holding up heavy objects. He testified that he would sell used shoring frames for between $80 and $90 per piece, and he would rent them for $10 per piece, per month. He identified the scaffolding depicted in Edginton's photographs as a "step frame," which is a type of masonry scaffolding.

¶11. Walters testified at trial and called several witnesses in his defense. The bulk of the defense witnesses' testimony dealt with the construction of Walters's house around 2010 and the subsequent clearing of his property after the house burned down. Walters admitted to renting a forklift from McGraw Rental on February 7, 2012, and selling a load of scrap metal to General Recycling on February 9, 2012. However, Walters claimed that he owned the scaffolding depicted in the photographs retrieved from General Recycling. Walters stated that he regularly purchased "cars, tractors, motors, pipe," and sold them to scrap yards and recycling mills when the prices were high. When prices were low, he would store these items

5

on his property, where he also lives. He testified that he also owned a large quantity of scaffolding because he previously had attempted to build a house on his property. Walters admitted into evidence a receipt indicating that he had purchased 350 pieces of scaffolding from a man named Sam Young in 2006. Several witnesses testified to visiting Walters's property while he was building his home and seeing scaffolding surrounding the home. The witnesses also confirmed that Walters's house had burned down in 2010.

¶12. Several witnesses testified that, on February 8, 2012, Walters and some friends and family members met at his property to clear the debris from the house fire to make room for a new mobile home. Walters testified that he rented a forklift from McGraw Rental to help him clear the property. Walters loaded scrap metal, which included scaffolding that was burned in the house fire, onto a trailer to take to the recycling mill. According to Walters, at the end of the day, Bailey asked to borrow the forklift. Walters obliged, and Bailey drove the forklift off the property. Walters claimed that he did not know why Bailey wanted to borrow the forklift. Walters also stated that the only time he had ever visited Nelson's property was to pick up the forklift from Turner on the evening of February 9, 2012.

¶13. At the conclusion of trial, the jury returned a verdict finding Walters guilty of grand larceny. The trial court sentenced him to serve ten years in the custody of the Mississippi Department of Corrections. Walters now appeals to this Court, raising the following issues:

    **I.**      **Whether the trial court erred in its application of the grand-larceny statute.**

    **II.**      **Whether the trial court erred in quashing the subpoena of Arnold Bailey.**

**III.**     **Whether the trial court erred in admitting Google Earth images of Walters's property into evidence.**

**IV.**     **Whether Walters's trial counsel rendered constitutionally ineffective assistance.**

**V.**     **Whether the trial court's rulings were the result of bias or prejudice.[3]**

## DISCUSSION

**I.**     **Whether the trial court erred in its application of the grand-larceny statute.**

¶14. Walters was charged with committing grand larceny in violation of Section 97-17-41 of the Mississippi Code. On the day of the offense, Section 97-17-41 provided:

> Every person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Five Hundred Dollars ($500.00) or more, shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding ten (10) years.

Miss. Code Ann. § 97-17-41 (2013) (emphasis added). In July 2014, after Walters's indictment but before his conviction, the Legislature amended Section 97-17-41 to provide, in pertinent part:

> (1)     Any person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of One Thousand Dollars ($1,000.00) or more, but less than Five Thousand Dollars ($5,000.00), shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding five (5) years; or shall be fined not more than Ten Thousand Dollars ($10,000.00), or both. The total value of property taken and carried away by the person from a single victim shall be aggregated in determining the gravity of the offense.

---

[3] Issues I, II, and III are raised by Walters's appellate counsel. Issues IV and V are raised by Walters in a pro se supplemental brief.

7

(2)     Any person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Five Thousand Dollars ($5,000.00) or more, but less than Twenty-five Thousand Dollars ($25,000.00), shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding ten (10) years; or shall be fined not more than Ten Thousand Dollars ($10,000.00), or both. The total value of property taken and carried away by the person from a single victim shall be aggregated in determining the gravity of the offense.

(3)     Any person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Twenty-five Thousand Dollars ($25,000.00) or more, shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding twenty (20) years; or shall be fined not more than Ten Thousand Dollars ($10,000.00), or both. The total value of property taken and carried away by the person from a single victim shall be aggregated in determining the gravity of the offense.

Miss. Code Ann. § 97-17-41 (Supp. 2016) (emphasis added). At Walters's third and final trial, which occurred in 2015, the trial court instructed the jury, based on the pre-amendment version of the statute, that it could convict Walters of grand larceny if it found that the stolen scaffolding had a value of $500 or more. Walters did not object to this instruction. After the jury reached its verdict, the trial court sentenced Walters to serve ten years in the custody of the Mississippi Department of Corrections, again based on the pre-amendment version of the statute. Walters did not object to the sentence imposed by the trial court.

¶15.    On appeal, Walters presents a two-fold argument that the trial court should have applied the post-amendment version of Section 97-17-41 at trial. First, he argues that the trial court erred in instructing the jury that the minimum-value element of grand larceny was $500, rather than $1,000. Next, he argues that the trial court erred in failing to sentence him under the version of Section 97-17-41 that existed at the time of his conviction.

8

¶16. Walters did not present the above arguments to the trial court. Thus, he is procedurally barred from raising them for the first time on appeal. "We will not hold a trial court 'in error on appeal for a matter not presented to it for decision.'" *Moffett v. State*, 49 So. 3d 1073, 1101 (Miss. 2010) (quoting *Mills v. Nichols*, 467 So. 2d 924, 931 (Miss. 1985)). This Court can review Walters's claims only for plain error. "The plain error doctrine requires that there be an error and that the error must have resulted in a manifest miscarriage of justice." *Williams v. State*, 794 So. 2d 181, 187 (Miss. 2001) (citing *Gray v. State*, 549 So. 2d 1315, 1321 (Miss. 1989)), *overruled on other grounds by Brown v. State*, 995 So. 2d 698, 703 (Miss. 2008). "To determine if plain error has occurred, we must determine 'if the trial court has deviated from a legal rule, whether the error is plain, clear or obvious, and whether the error has prejudiced the outcome of the trial.'" *McGee v. State*, 953 So. 3d 211, 215 (Miss. 2007) (quoting *Cox v. State*, 793 So. 2d 591, 597 (Miss. 2001)). As explained below, we find that the trial court's application of the pre-amendment version of Section 97-17-41 was not erroneous.

### A. Whether the trial court erred in instructing the jury on the elements of grand larceny.

¶17. Walters argues that the trial court should have instructed the jury that it was required to find that the value of the stolen property was "$1,000 or more," in accordance with the amended version of Section 97-17-41, in order to find him guilty of grand larceny. This argument is without merit. The value of the property stolen is an essential element of grand larceny that the State must prove beyond a reasonable doubt. *See Henley v. State*, 729 So. 2d 232, 238 (Miss. 1998) ("Without evidence as to the value of the [stolen property], the

9

State has failed to meet its burden of proof as to one of the elements of grand larceny and conviction of same cannot be upheld."). "The authority to define crimes and provide the punishment therefor is vested exclusively in the Legislature." *State v. Russell*, 358 So. 2d 409, 411 (Miss. 1978) (citing *Howell v. State*, 300 So. 2d 774 (Miss. 1974)). And the Legislature has given strict instruction that the definition of a crime is controlled by the relevant criminal statute in place at the time the crime was committed. Section 99-19-1 of the Mississippi Code provides:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, *unless otherwise specially provided in such statutes*.

Miss. Code Ann. § 99-19-1 (Rev. 2015). The amendment to Section 97-17-41 does not specifically provide that the Legislature intended it to apply retroactively to crimes that occurred before its effective date. Thus, the plain language of Section 99-19-1 required the trial court to instruct the jury on the elements of grand larceny as they existed at the time the crime was committed. This Court has reached the same conclusion in addressing amendments to the value element of felony shoplifting found in Section 97-23-93. *See Moore v. State*, 187 So. 3d 109, 113-14 (Miss. 2016); *Wilson v. State*, 967 So. 2d 32, 41-42 (Miss. 2007). Walters's argument that he should receive the benefit of a jury instruction

10

listing the elements of grand larceny as they existed at the time of trial, rather than at the time the crime was committed, is without merit.

### B.     Whether the trial court erred in sentencing Walters.

¶18.    As previously stated, Section 99-19-1 establishes that the punishment for a crime is controlled by the version of the relevant criminal statute in place at the time the crime was committed, "notwithstanding amendatory or repealing statutes, *unless otherwise specially provided in such statutes*." Miss. Code Ann. § 99-19-1 (Rev. 2015) (emphasis added). Thus, under Section 99-19-1, the trial court is bound by a subsequent sentencing amendment only when the amending act specifically provides for application to the case in question. *See, e.g., **West v. State***, 725 So. 2d 872, 879 (Miss. 1998), *overruled on other grounds by **Wilson v. State***, 194 So. 3d 855 (Miss. 2016) (holding that 1994 amendment to capital-murder statutes applied to defendant's trial for 1992 capital murder, where amendment specifically provided that it would apply to crimes committed before its effective date).

¶19.    Walters claims, however, that Section 99-19-33 of the Mississippi Code requires the trial court to apply ameliorative amendments to sentencing statutes.  That statute provides:

> If any statute shall provide a punishment of the same character, but of milder type, for an offense which was a crime under pre-existing law, then such milder punishment *may* be imposed by the court but no conviction, otherwise valid, shall be set aside and new trial granted merely because of an error of the court in fixing punishment.  Such error shall only entitle the party injured to vacate or reverse the judgment as to the punishment, and the legal punishment shall then be imposed by another sentence based on the original conviction or plea of guilty.

11

Miss. Code Ann. § 99-19-33 (Rev. 2015) (emphasis added). Walters argues that the trial court violated Section 99-19-33 by failing to sentence him under the amended grand-larceny statute.

¶20. Walters is correct that this Court previously has held that a trial court was required to apply ameliorative sentencing amendments enacted before the defendant's conviction, finding that the term "may" in Section 99-19-33 was "intended to invoke 'shall.'" *West v. State*, 725 So. 2d 872, 879 (Miss. 1998). However, this Court recently overruled that proposition, finding that the *West* Court had misinterpreted Sections 99-19-1 and 99-19-33. *Wilson*, 194 So. 3d at 872. Moreover, this Court has held that Section 99-19-33 applies only in cases in which the Legislature creates a new, separate crime with a lesser penalty that criminalizes the same behavior for which the defendant is being tried. *Id.* at 872 n.3. Walters's case does not fit that description, so Section 99-19-33 does not apply, and the trial court was bound by Section 99-19-1 to sentence him under the version of the grand-larceny statute that was in place at the time the crime was committed.[4] This argument is without merit.

**II. Whether the trial court erred in quashing the subpoena of Arnold Bailey.**

¶21. Walters and Bailey were indicted together for grand larceny, but they were tried separately, with the State electing to try Walters first. On January 26, 2015, the day before Walters's second trial began, Bailey was served with a subpoena requiring him to appear and

---

[4] Justice Kitchens's argument to the contrary is a reassertion of the arguments presented in his dissent in *Wilson*.

testify at the trial. In response, Bailey filed a motion to quash his subpoena, asserting that "[i]f the trial subpoena served upon him to give testimony in the trial of Douglas Walters is not quashed, Arnold Bailey will obviously exercise his rights to plead the 'Fifth Amendment' against possible self-incrimination." On the first day of Walters's second trial, prior to jury selection, the trial court held a hearing on the motion to quash. At the hearing, Bailey's attorney represented that, because Bailey was a named codefendant in Walters's indictment and had not yet been tried, he had advised Bailey to invoke his Fifth-Amendment privilege in response to any questions. Walters argued that he had a constitutional right to call witnesses in his defense, and that Bailey would have to exercise his own constitutional rights on the witness stand. However, Walters did not proffer any questions that he intended to ask Bailey. The trial court rejected Walters's argument, finding that it would not benefit the jury, and would likely prejudice Bailey, to require him to take the stand only to refuse to answer any questions.

¶22. After the State had rested at the second trial, Walters asked the Court to revisit the issue of Bailey's testimony, arguing that the development of the State's evidence had made Bailey's testimony necessary. Specifically, Investigator Turner had testified that Walters did not ask for directions to Nelson's property when he came to pick up the forklift on the day of the crime. Walters contended that this testimony created an inference that he knew where Nelson's property was located, when in fact, Bailey had driven him there. Walters argued that Bailey was the only witness who could testify to this fact and provide context to Investigator Turner's testimony. The trial court rejected this argument, finding that it would

13

be self-incriminating to Bailey to require him to testify that he knew where Nelson's property was located. Accordingly, the trial court maintained its prior ruling on the motion to quash.

¶23. As previously discussed, Walters's second trial ended in a mistrial. Walters did not subpoena Bailey to testify at his third trial. During the third trial, the State did not question Investigator Turner about whether Walters had needed directions to Nelson's property. Now, on appeal from his conviction at his third trial, Walters argues that the trial court erred in quashing Bailey's subpoena at his second trial.

¶24. The trial court's decision to exclude testimony based on a witness's invocation of the Fifth-Amendment privilege against self-incrimination is reviewed for an abuse of discretion. *U.S. v. Boyett*, 923 F.2d 378, 379 (5th Cir. 1991). While it is true that a criminal defendant has a constitutional right to have compulsory process for obtaining witnesses in his favor, that right "must give way to the witness' Fifth Amendment privilege not to give testimony that would tend to incriminate him." *U.S. v. Khan*, 728 F.2d 676, 678 (5th Cir. 1984). "Calling a witness who will refuse to testify does not fulfill the purpose [of the Sixth Amendment right to compulsory process]." *U.S. v. Roberts*, 503 F.2d 598, 600 (9th Cir. 1974) (internal citation omitted). Thus, the Fifth Circuit has held that a trial court has the discretion to allow a witness to offer a "blanket" assertion of the Fifth-Amendment privilege without appearing before the jury:

> If it appears that a witness intends to claim the privilege as to essentially all questions, the court may, in its discretion, refuse to allow him to take the stand. Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of the privilege either alone or in conjunction with questions that have been put to him.

14

*U.S. v. Lacouture*, 495 F.2d 1237, 1240 (5th Cir. 1974) (citations omitted). This Court has held that a "blanket" invocation of a witness's Fifth-Amendment privilege is appropriate in a criminal proceeding where the record reflects that:

> (1) the witnesses are potential accessories to the same crime; (2) the witnesses upon the advice of their lawyers, would have invoked their Fifth Amendment privilege to each and every specific question, and (3) the trial judge has sufficient information to determine, in fact, that answering any questions at all about the offense would tend to incriminate the witnesses.

*Edmonds v. State*, 955 So. 2d at 793 (citing *Woodham v. State*, 800 So. 2d 1148, 1154-55 (Miss. 2001)).

¶25. In this case, the trial court did not abuse its discretion in accepting Bailey's invocation of his Fifth-Amendment privilege and quashing his subpoena. Walters and Bailey were charged as codefendants in the same indictment, and at the time Bailey received the subpoena, he still was awaiting trial. On the advice of counsel, Bailey invoked his privilege as to all questions Walters would have asked him. At the hearing on the motion to quash prior to Walters's second trail, Walters did not proffer any specific questions he intended to ask Bailey. And, based on the evidence in the record, the trial court reasonably concluded that any relevant questions Walters sought to ask Bailey would tend to incriminate him. *See U.S. v. Goodwin*, 625 F.2d 693, 701 (5th Cir. 1980) (holding that, when a witness invokes the Fifth-Amendment privilege, the trial court may exclude the witness from testifying upon finding that he or she "could legitimately refuse to answer essentially all relevant questions."). Accordingly, Walters did not have the right to place Bailey on the witness stand for the sole purpose of having him "plead the Fifth." *See Lacouture*, 495 F.2d at 1240.

¶26. Moreover, Bailey's absence at the second trial had no arguable effect on the jury's verdict in Walters's third trial. Walters's only stated purpose for calling Bailey as a witness was to refute Investigator Turner's testimony that Walters did not ask for directions to Nelson's property, which created an alleged inference that he knew where the property was located. This argument was offered only at Walters's second trial, which ended in a mistrial. Walters did not subpoena Bailey to testify at his third trial, and the State did not ask Investigator Turner during the third trial about whether Walters needed directions to locate Nelson's property. Instead, during Walters's cross-examination of Investigator Turner at the third trial, he raised the issue of whether Bailey had driven Walters to Nelson's property to retrieve the forklift.[5] After consulting his report, Investigator Turner confirmed that Bailey was with Walters when he came to Nelson's property to pick up the forklift. Thus, the alleged inference of guilt which Walters claims necessitated Bailey's testimony never arose at the third trial. This argument is without merit.

III.    **Whether the trial court erred in admitting Google Earth images of Walters's property into evidence.**

¶27. At trial, Walters testified that his house had burned down in 2010, and that he was clearing debris and construction materials, including scaffolding, from his property in February 2012 to make room for a new mobile home. Thus, he claimed that he sold his own scaffolding, not Nelson's, to General Recycling on February 9, 2012. On cross-examination,

---

[5] Investigator Turner's quoted statement in Justice Kitchens's dissenting opinion was given in response to a question posed by Walters on cross-examination at the third trial, not by the State.

Walters denied that he had cleared his property or placed a new mobile home there prior to February 2012.

¶28.    The State presented two rebuttal witnesses to challenge Walters's version of events. First, the State called Keith Chandler, a building inspector and code enforcement officer for the City of Brandon.  Chandler visited Walters's property on August 11, 2011, to determine whether the debris from the 2010 house fire had been removed. Chandler testified that the area where the house once stood had been cleared and cleaned up.  The State admitted into evidence several photographs Chandler took during his visit to Walters's property, none of which showed any scaffolding on the property.  Based on Chandler's testimony, the State argued that Walters could not have cleared his property and sold his own scaffolding to General Recycling on February 9, 2012, because his property already had been cleared some time prior to August 2011.

¶29.    The State also called Lance Cooper as a rebuttal witness.  Cooper is the Geographic Information System Director for Rankin County. He testified that he regularly uses several satellite imaging programs, including Google Earth, to verify the locations of properties within the county for tax assessment and mapping purposes. During Cooper's testimony and over Walters's objections, the State admitted three satellite photographs from Google Earth's "Historical Imagery" feature[6] depicting Walters's property on May 2, 2010, November 4, 2011, and December 20, 2012.  The first photograph depicts Walters's home as it existed

---

[6] The Historical Imagery feature became available on Google Earth in February 2009. John Hanske, "Dive into the new Google Earth." Google Official Blog (February 2, 2009), https://googleblog.blogspot.com/2009/02/dive-into-new-google-earth.html. (Last visited Nov. 29, 2016).

before it burned down in October 2010. However, the second photograph depicts a different house on Walters's property in November 2011, four months before Walters allegedly cleared his property. The third photograph appears to show the same house as the second photograph, with some apparent additions.

¶30. Walters objected to the admission of these images at trial, claiming that they could not be authenticated properly by Cooper. Walters argued that Cooper had no knowledge of how the images were taken and had never been to the property in question. Walters also argued that the images were inadmissible hearsay. The trial court overruled Walters's objections and allowed the admission of these images into evidence. On appeal, Walters reasserts his original objections to the images, claiming that they constitute inadmissible hearsay and were not authenticated properly. When reviewing the evidentiary rulings of a trial court, this Court employs an abuse of discretion standard. *Brown v. State*, 965 So. 2d 1023, 1026 (Miss. 2007) (citations omitted). In addition, "[w]hether the evidence presented satisfies Rule[] 901 of the Mississippi Rules of Evidence is a matter left to the discretion of the trial judge . . . . His decision will be upheld unless it can be shown that he abused his discretion." *Ragin v. State*, 724 So. 2d 901, 903 (Miss. 1998) (citations omitted).

¶31. We find Walters's hearsay argument to be without merit. The trial court found that the images were admissible under the residual hearsay exception found in Mississippi Rule of Evidence 804(b)(5). But this finding was unnecessary, as the images themselves were not hearsay.[7] Hearsay is defined as "a *statement* that (1) the *declarant* does not make while

---

[7]Justice Kitchens takes issue with the labels and date stamps contained within the satellite images, arguing that they also constitute hearsay. Walters did not raise those issues

18

testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Miss. R. Evid. 801(c) (emphasis added). "Declarant" is defined as "the *person* who made the *statement*." Miss. R. Evid. 801(b) (emphasis added). And a statement is defined as "a *person's* oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Miss. R. Evid. 801(a) (emphasis added). Simply put, a photograph does not meet the definition of a "statement," so it cannot qualify as hearsay under our rules of evidence. *See* **U.S. v. Lizarraga-Tirado**, 789 F.3d 1107, 1109 (9th Cir. 2015) ("[A] photograph merely depicts a scene as it existed at a particular time . . . . Because a satellite image, like a photograph, makes no assertion, it isn't hearsay."). The trial court did not abuse its discretion in overruling Walters's hearsay objection.

¶32.    Likewise, Walters's argument as to the authenticity of the photographs is without merit. "To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Miss. R. Evid. 901(a). "A party need only make a prima facie showing of authenticity, not a full argument on admissibility. Once a prima facie case is made, the evidence goes to the jury and it is the jury who will ultimately determine the authenticity of the evidence, not the court." **Sewell v. State**, 721 So. 2d 129, 140 (Miss. 1998) (quoting **U.S. v. McGlory**, 968 F.2d 309, 328-29 (3d Cr. 1992)). The State made this prima facie showing through Cooper's testimony that the photographs accurately depicted

---

before the trial court or on appeal. Accordingly, those matters are procedurally barred. "The well-recognized rule is that the trial court will not be put in error on appeal for a matter not presented to it for decision." **Mills v. Nichols**, 467 So. 2d 924, 931 (Miss. 1985).

Walters's property on the dates stated therein. Walters did not offer any evidence contradicting Cooper's testimony prior to the admission of the photographs. Accordingly, we find that the trial court did not abuse its discretion in finding that the photographs had been properly authenticated.

**Issues asserted in Walters's pro se supplemental brief**:

**IV.     Whether Walters received ineffective assistance of counsel**

**V.     Whether the trial court erred in allowing personal bias to influence Walters's trial and sentencing.**

¶33.    In his pro se supplemental brief, Walters raises two interrelated arguments based on the belief that he could not be convicted of grand larceny because Section 97-17-41 was amended prior to his conviction. First, he argues that he received ineffective assistance of counsel when his trial attorney failed to raise the amendment of Section 97-17-41 at trial, thereby allowing him to be tried as a felony defendant under facts that constituted a misdemeanor under the amended statute. Second, he argues that the trial court displayed bias and prejudice by imposing a felony sentence for what, according to Walters, was a misdemeanor offense. However, as previously discussed, Walters's prosecution and punishment for grand larceny were controlled by the version of Section 97-17-41 that existed at the time the crime was committed. Accordingly, Walters's arguments clearly are without merit and do not warrant further discussion.

**CONCLUSION**

¶34.    For the foregoing reasons, we affirm Walters's conviction and sentence.

20

¶35. **CONVICTION OF GRAND LARCENY AND SENTENCE OF TEN (10) YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, AFFIRMED. APPELLANT SHALL PAY COURT COSTS, FEES AND ASSESSMENTS IN THE AMOUNT OF $731.50 WITHIN SIX (6) MONTHS AFTER RELEASE FROM CUSTODY. APPELLANT SHALL RECEIVE CREDIT FOR TIME SERVED IN PRETRIAL DETAINMENT.**

**RANDOLPH, P.J., COLEMAN, MAXWELL AND BEAM, JJ., CONCUR. DICKINSON, P.J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED IN PART BY KITCHENS, J. KITCHENS, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J.; DICKINSON, P.J., JOINS IN PART. LAMAR, J., NOT PARTICIPATING.**

**DICKINSON, PRESIDING JUSTICE, DISSENTING:**

¶36. I join Justice Kitchens's analysis and conclusion that the circuit judge committed reversible error by quashing the subpoena for Arnold Bailey's testimony. But I believe the judge applied the correct version of the grand larceny statute, and that Lance Cooper's testimony sufficiently authenticated the Google Earth Images.

**KITCHENS, J., JOINS THIS OPINION IN PART**.

**KITCHENS, JUSTICE, DISSENTING:**

¶37. Because I find Douglas Walters's assignments of error to be meritorious, I would reverse the judgment and remand this case to the Circuit Court of Rankin County. Accordingly, I respectfully dissent.

¶38. First, the trial court erred in applying the harsher penalty provided in the earlier version of the grand larceny statute. Previously, the statute provided, in pertinent part, that "[e]very person who shall be convicted of taking and carrying away, feloniously, the personal property of another, of the value of Five Hundred Dollars ($500.00) or more, shall be guilty of grand larceny, and shall be imprisoned in the Penitentiary for a term not exceeding ten

21

(10) years . . . ." Miss. Code Ann. § 97-17-41(1) (2006). Effective July 1, 2014, the statute

was amended to change the minimum value[8] of the "personal property of another" to "One

Thousand Dollars ($1,000.00) or more, but less than "Five Thousand Dollars ($5,000.00)."

Miss. Code Ann. § 97-17-41(1) (Rev. 2014). The penalty was changed to imprisonment "in

the Penitentiary for a term not exceeding five (5) years . . . ." *Id.*

¶39.    Mississippi Code Section 99-19-33 provides:

> If any statute shall provide a punishment of the same character, but of milder
> type, for an offense which was a crime under pre-existing law, then such
> milder punishment may be imposed by the court but no conviction, otherwise
> valid, shall be set aside and new trial granted merely because of an error of the
> court in fixing punishment. Such error shall only entitle the party injured to
> vacate or reverse the judgment as to the punishment, and the legal punishment
> shall then be imposed by another sentence based on the original conviction or
> plea of guilty.

Miss. Code Ann. § 99-19-33 (Rev. 2015). Walters states that:

> This Court has interpreted Section 99-19-33 to mean that "[t]he trial court
> judge does not have discretion to sentence a defendant under the law in effect
> at the time of the commission of the crime where the sentencing statute has
> been amended to provide for a lesser penalty and the amended statute is in
> effect at the time of conviction."

(quoting **Daniels v. State**, 742 So. 2d 1140, 1145 (Miss. 1999), *overruled by* **Wilson v. State**,

194 So. 3d 855 (Miss. 2016)) (citing **West v. State**, 725 So. 2d 872 (Miss. 1998), *overruled*

*by* **Wilson v. State**, 194 So. 3d 855 (Miss. 2016)). Further, Walters argues, "[w]hen a statute

is amended to provide for a lesser penalty, and the amendment takes effect before sentencing,

---

[8] The amended version of the statute prescribed varying personal property values and
penalties. *See* Miss. Code Ann. § 97-17-41(1)-(3) (Rev. 2014).

the trial court must sentence according to the statute as amended." (quoting ***Daniels***, 742 So. 2d at 1145).

¶40. It is true, as the majority observes, that Mississippi Code Section 99-19-1 provides that:

> No statutory change of any law affecting a crime or its punishment or the collection of a penalty shall affect or defeat the prosecution of any crime committed prior to its enactment, or the collection of any penalty, whether such prosecution be instituted before or after such enactment; and all laws defining a crime or prescribing its punishment, or for the imposition of penalties, shall be continued in operation for the purpose of providing punishment for crimes committed under them, and for collection of such penalties, notwithstanding amendatory or repealing statutes, *unless otherwise specially provided in such statutes*.

Miss. Code Ann. § 99-19-1 (Rev. 2015) (emphasis added). But the majority states that "[t]he amendment to Section 97-17-41 does not specifically provide that the Legislature intended it to apply retroactively to crimes that occurred before its effective date." Maj. Op. ¶ 17. With respect, I disagree. The amended Section 97-17-41 specially provided that it was to be effective "from and after July 1, 2014," and that "[a]*ny person who shall be convicted* of taking and carrying away, feloniously, the personal property of another, of the value of One Thousand Dollars ($1,000.00) or more . . . shall be guilty of grand larceny and shall be imprisoned in the Penitentiary for a term not exceeding five (5) years." Miss. Code Ann. § 97-17-41 (Rev. 2014) (emphasis added). *See also **West**,* 725 So. 2d at 879. Here, the statutory changes took effect July 1, 2014, and Walters was convicted on June 11, 2015.

¶41. It is correct, as the majority finds, that this Court has held that the date of the crime is relevant for determining under which version of the statute the jury should be instructed.

23

In *Christine Wilson v. State*, this court held that "section 99-19-33 and *Daniels* are totally irrelevant to today's discussion" because "we are not dealing with an amended sentencing statute, but instead an amended statute as it relates to the elements of the criminal offense." *Wilson v. State*, 967 So. 2d 32, 42 (Miss. 2007). This Court came to the same conclusion in *Moore v. State*, 187 So. 3d 109, 114 (Miss. 2016). But in the present case, Section 99-19-33 and *Daniels* would be relevant, because not only did the value element change (from $500 to $1,000), but the penalty also changed (from ten years to five years) under the amended version of Section 97-17-41 (Rev. 2014).

¶42.     In *Randy Charles Wilson v. State*, however, a majority of this Court said that "[t]he Court may be able to overrule its own cases, but absent a showing beyond a reasonable doubt that a statute is unconstitutional, the Court may not overrule statutes" and that "Section 99-19-1 should dictate today's result." *Wilson*, 194 So. 3d at 868. In *West*, as in *Daniels*, this Court determined that Section 99-19-33 gave the trial court no discretion with regard to the application of the more lenient amended statutory penalty. *West*, 725 So. 2d at 882. The Court held that: "As we do with *West*, we overrule *Daniels* to the extent that it holds that Section 99-19-33 requires a sentencing court to apply a newer sentencing statute instead of the sentencing scheme in effect when a crime was committed." *Id.* at 874. And "Section 99-19-1 clearly requires the trial court to sentence an offender under a sentencing statute in place at the time of the crime." *Id.*

¶43.     The majority argued that "the *West* Court's striking the word 'may' in favor of 'shall' results in the judicial abrogation of Section 99-19-1, which explicitly obligates the trial court

24

to do that which the *West* Court rewrote Section 99-19-33 to prohibit." *Id.* at 872. In a separate opinion, I responded by pointing out that this Court had not stricken "the word 'may' and substitute[d] the word 'shall' in *West*, but rather engaged in a reasonable interpretation of a self-contradictory statute." *Wilson*, 194 So. 3d at 877 (Kitchens, J., concurring in part, dissenting in part). "In its first sentence, Section 99-19-33 provides that the trial court has discretion with regard to sentencing and, in the second sentence, it provides that erroneous sentencing entitles the defendant to a reversal of the punishment and not the reversal of the conviction." *Id.*

¶44.  In the present case, as in *Wilson*, I maintain my position that the interpretation in *Daniels* and *West* should control and that the trial court should have sentenced Walters to "a term not exceeding five (5) years" in accordance with the 2014 amendment of Mississippi Code Section 97-17-41. As I said in *Wilson*, "Section 99-19-1 does not apply to this case, nor did it apply in *West*, because [Section 97-17-41 as amended] incorporated an effective date, after which [Walters was] . . . tried, convicted, and sentenced." *Id.*

¶45.  I also agree with Walters's second assignment of error in which he argues that the trial court erroneously granted the motion to quash the subpoena for Walters's codefendant, Arnold Bailey. This Court has held that:

> [T]he trial court's refusal to allow [codefendant] to be called to the stand by appellant and questioned in the presence of the jury, even though it had been demonstrated that he would refuse to answer most of the questions propounded to him on the grounds that the answers would tend to incriminate him, was reversible error.

25

*Stewart v. State*, 355 So. 2d 94, 96 (Miss. 1978). In that case, Tommie Lee Stewart had been convicted of assaulting a police officer and wanted to allow Bert Brown to be called to the witness stand "even though the court knew that Brown would refuse to answer most of the questions on grounds of self-incrimination." *Id.* at 94. Stewart argued that his own "involvement in the fracas was limited to an attempt to pull Bert Brown off Officer Young." *Id.* The Court considered that "allowing Brown to be questioned in the presence of the jury may open the door for defense counsel to attempt to impeach Brown by asking questions he knows Brown will refuse to answer and by inference get inadmissible evidence before the jury," but the Court observed that "the potential for a miscarriage of justice is minimal, particularly in view of the fact that the jury can be instructed not to draw any inferences from the witness' assertion of his Fifth Amendment privilege." *Id.* at 95.

¶46.    In *Hall v. State*, this Court reversed and remanded a case because an accomplice's testimony "describing the appearance and characteristics of [the victim] was relevant to the determination of who committed the robbery" and the accomplice "should have been permitted to testify in the presence of the jury and either answer those relevant questions or claim his Fifth Amendment rights." *Hall v. State*, 490 So. 2d 858, 859 (Miss. 1986). Likewise, in *Coleman v. State*, the Court determined that the evidence was conflicting with regard to whether the defendant or the codefendant, or both, had sold cocaine. *Coleman v. State*, 388 So. 2d 157, 159 (Miss. 1980). The Court determined that "in order to perform its function in this case, it was necessary for the jury to hear the testimony of the parties involved in the sale" and that "[i]t was important to the defense to have the jury hear the

26

codefendant either answer questions or else claim her Fifth Amendment rights about her knowledge of the sale of cocaine." *Id.* The court reversed and remanded the case because "it was reversible error for the circuit court to refuse the request of Coleman to question [the codefendant] in the presence of the jury and have her either answer relevant questions or claim her Fifth Amendment rights." *Id.*

¶47. More recently, this Court reversed and remanded a defendant's conviction of possession of cocaine with intent to distribute. *Hannah v. State*, 111 So. 3d 1196, 1201 (Miss. 2013). In that case, the trial court denied the defendant's motion for continuance, which had been sought in order to call as a witness the codefendant. *Id.* at 1198. The defense contended that it was the codefendant who had been selling the drugs and that, as such, the codefendant was an indispensable witness. *Id.* This Court stated the following:

> It is well-settled in Mississippi that a "criminal defendant must be allowed to call witnesses to the stand even though the defendant is aware that the witness, if called, will invoke the Fifth Amendment to every question." *Balfour v. State*, 598 So. 2d 731, 751 (Miss. 1992). "It is not enough to presume or suspicion [sic] that someone will assert his Fifth Amendment privilege against self-incrimination and refuse to testify. [He] must be called to the stand and there refuse to testify before [he] becomes unavailable due to invoking the Fifth Amendment." *Slater v. State*, 731 So. 2d 1115, 1117 (Miss. 1999).

*Id.* at 1201.

¶48. The Court cited *Stewart* and *Coleman* and continued: "Like the defendants in *Stewart* and *Coleman*, Hannah desired to call a witness, his coindictee, who was 'involved in the [event] which was the subject of the criminal prosecution.'" *Hannah*, 111 So. 3d at 1202 (quoting *Coleman*, 388 So. 2d at 159). This Court held that the circuit court's prediction of the inevitability of the codefendant's invocation of the Fifth Amendment privilege was

27

unavailing in light of "Hannah's constitutional right 'to have the jury hear the [witness] either answer questions or else claim h[is] Fifth Amendment rights.'" *Id.*

¶49.    The majority cites *Edmonds v. State* in support of its argument that this Court has approved "[a] blanket claim of the [Fifth Amendment] privilege where the proceeding is criminal in nature . . . ." *Edmonds v. State*, 955 So. 2d 787, 793 (Miss. 2007) (quoting *Woodham v. State*, 800 So. 2d 1148, 1153-54 (Miss. 2001)). First, *Edmonds* cites *Stewart*, *Hall*, and *Coleman* with approval. *Edmonds*, 955 So. 2d at 793-94. Second, the question before the Court in *Edmonds* was not, as here, whether the trial court erred by quashing the subpoena of the codefendant because the codefendant would assert his privilege against self-incrimination. Rather, the question this Court answered in *Edmonds* was whether "a witness who intends to invoke the Fifth becomes 'unavailable' under [Mississippi Rule of Evidence] 804." *Id.* at 793. Third, this Court in *Edmonds* quoted *Woodham v. State*, which stated the following: "[t]he State submits that a blanket claim of privilege is proper . . . ." *Woodham*, 800 So. 2d at 1153. But *Woodham* cited no authority to support that proposition.

¶50.    The majority finds that the claimed necessity for Bailey's testimony never arose in Walters's third trial. Walters's lawyer objected as follows in the second trial:

> Your Honor, as I want to go back, as I talked to you off the record awhile ago, in the presence of the prosecution, the matter of the quashing of the subpoena that was served on Mr. Arnold Bailey, actually, the codefendant of my -- my client, Mr. Walters. The testimony from the state now has been developed to where they have given the inference or the inference has gone to the jury that because my client called Officer Turnage [sic] and asked for the key to that Bobcat, or whatever it is, the forklift, after Mr. Bailey was visited, I guess, because I don't -- I don't think he was arrested at that time on February the 9th, two thousand -- yeah, February the 9th of 2010 -- of 12, because my client came and got the key so he could return the Bobcat; that he didn't ask for

28

directions to the place where the -- where the Bobcat was, and so that -- that gives the inference that he knew where it was. When in truth and, in fact, he did come get the key, but Mr. Bailey took it and took -- and took him down to where it was so he could get it and get it loaded up and take it back to McGraw Rentals in Ridgeland, Mississippi. Mr. Bailey would be probably the only one, I think he is the only one that, other than my client, that can testify that he took Mr. Walters down to where the Bobcat was.

In the second trial, the trial court stood by its original ruling denying the motion to quash Bailey's subpoena: "And under the law, what we've been advised is that he's going to claim those Fifth Amendment Rights to anything except his name, then he's not required to be put on the stand for that purpose."

¶51. The majority finds that "during Walters's cross-examination of Investigator Turner at the third trial, he raised the issue of whether Bailey had driven Walters to Nelson's property" and that "[a]fter consulting his report, Investigator Turner confirmed that Bailey was with Walters when he came to Nelson's property to pick up the forklift." On cross examination, Investigator Turner was asked in whose vehicle Bailey and Walters had driven to the property. Turner responded, "I don't remember which vehicle they came in. It could have been Mr. Walters'. It could have been Mr. Bailey's. But, regardless, *Mr. Walters did not have to ask for directions to come get the forklift that he rented*." (Emphasis added.) The same testimony that was before the jury in the second trial again came before the jury in the third trial. And Walters's reason for having Bailey testify to rebut the State's theory, that Walters did not have to ask for directions to retrieve the forklift he had rented and loaned to Bailey, remains a viable one.

¶52. I would hold here that Walters should have been allowed to question Bailey, irrespective of whether Bailey refused to answer some or all of the questions by asserting his Fifth Amendment privilege against self-incrimination. Because the trial court erred in granting the motion to quash Bailey's subpoena and disallowing Walters's questioning of Bailey, I would, in accordance with **Stewart**, **Hall**, **Coleman**, and **Hannah**, reverse this judgment and remand the case to the Circuit Court of Rankin County for a new trial.

¶53. Finally, the trial court erred in allowing Google Earth images of Walters's property to be admitted in evidence. The trial court's ruling with regard to the authentication and admissibility of this evidence was twofold: (1) the Google Earth images were properly authenticated under Mississippi Rule of Evidence 901, and (2) the Google Earth images were admissible under the exception to the hearsay rule found in Rule 804(b)(5).

¶54. As a rebuttal witness, the State called Lance Cooper, the Geographic Information System Director for Rankin County, whose job entails pinpointing property locations for tax assessment purposes. Cooper routinely relies on the historical imagery function of Google Earth. Counsel for Walters objected, arguing that Cooper had not been qualified to give expert testimony and that he could not authenticate pictures he did not take. After a proffer, the trial court ruled that Cooper's testimony was authenticated sufficiently "to show that these pictures are what they purport to be and that they are reliable and they are used in the course of the business of the Rankin County Tax Assessor's Office and have been confirmed to be reliable in the past." The trial court further ruled that the images were not hearsay

30

because "805(b)5 is applicable here, the trustworthiness of the pictures" and that "Google Earth would have no incentive to falsify or alter the pictures."

¶55.    Cooper testified that, in the course and scope of his business, he compares Google Earth images to "aerial photography that the county shoots on a 5 to 10-year basis," and uses "that as a base comparison to base against Google Earth." The State wanted to impeach Walters's testimony that the scaffolding he sold to General Recycling on February 9, 2012, belonged to him and that he had been cleaning debris and construction materials at that time to make room for a mobile home. State's Exhibit 81 is a Google Earth image, an aerial satellite photograph, with an "Imagery Date" of May 2, 2010, and an illustrated thumb tack followed by the words "Douglas Walters Home." It depicts a lot and what appears to be a house. State's Exhibit 82 is a similar aerial satellite photograph, but bears an "Imagery Date" of November 4, 2011, which depicts a lot and what appears to be a mobile home. State's Exhibit 83 is also a similar aerial satellite photograph, but bears an "Imagery Date of December 20, 2012. Cooper testified that the three photographs showed 138 Mary Miles Drive and that the photographs were true and accurate photographs on or about, May 2, 2010, November 4, 2011, and December 20, 2012.

¶56.    To reject Walters's hearsay argument, the majority cites *U.S. v. Lizarraga-Tirado*, 789 F. 3d 1107, 1109 (9th Cir. 2015), which states that "a photograph merely depicts a scene as it existed at a particular time . . . . Because a satellite image, like a photograph, makes no assertion, it isn't hearsay." But, in that case, a "digital tack labeled with a set of GPS coordinates" appeared in the Google Earth satellite image, which matched the coordinates

the officer who arrested the defendant recorded. *Id.* at 1108. The coordinates showed that the arrest took place north of the border and that the defendant had been arrested in the United States. *Id.*

¶57.    The United States Court of Appeals for the Ninth Circuit observed that "[t]he tack and coordinates present a more difficult question," because, "[u]nlike a satellite image, labeled markers added to a satellite image do make clear assertions. Indeed, that is what makes them useful." *Id.* at 1109. According to the court, "[i]f the tack is placed manually and then labeled (with a name or GPS coordinates), it's classic hearsay, akin to *Aronson v. McDonald*, 248 F. 2d 507, 508–09 (9th Cir.1957), where we held that hand-drawn additions to a map—there, topography lines—were hearsay." *Id.*   The court continued:

> Because there was no evidence at trial as to how the tack and its label were put on the satellite image, we must determine, if we can, whether the tack was computer-generated or placed manually. Fortunately, we can take judicial notice of the fact that the tack was automatically generated by the Google Earth program. By looking to "sources whose accuracy cannot reasonably be questioned"—here, the program—we can "accurately and readily determine [ ]" that the tack was placed automatically. *See* Fed. R. Evid. 201(b). Specifically, we can access Google Earth and type in the GPS coordinates, and have done so, which results in an identical tack to the one shown on the satellite image admitted at trial.

*Id.*

¶58.    The court concluded that "[a] tack placed by the Google Earth program and automatically labeled with GPS coordinates isn't hearsay" because:

> [T]he relevant assertion isn't made by a person; it's made by the Google Earth program. Though a person types in the GPS coordinates, he has no role in figuring out where the tack will be placed. The real work is done by the computer program itself. The program analyzes the GPS coordinates and, without any human intervention, places a labeled tack on the satellite image.

*Id.* at 1110. The court continued, however: "That's not to say machine statements don't present evidentiary concerns," because "[a] machine might malfunction, produce inconsistent results or have been tampered with." *Id.* The court stated that "such concerns are addressed by the rules of authentication, not hearsay," and that the "defendant didn't raise an authentication objection at trial, nor does he raise one on appeal." *Id.*

¶59. Here, a similar tack appears, but it does not contain mere coordinates, as did the Google Earth satellite image in *Lizarraga-Tirado*. It bears the phrase "Douglas Walters Home." As in *Lizarraga-Tirado*, no evidence was adduced as to how the tack and its label came to appear on the satellite image. But, here, we cannot say with certainty that the tack that purported to identify the "Douglas Walters Home" was generated automatically by a computer or was placed on the images manually.

¶60. Further, in *Lizarraga-Tirado*, no argument was made with regard to the Google Earth satellite images' authenticity. That issue is before this Court. The trial court ruled that the Google Earth satellite images could be authenticated by Cooper under Mississippi Rule of Evidence 901(b)(9), which provides that "[e]vidence describing a process or system and showing that it produces an accurate result" is sufficient to authenticate a piece of evidence. M.R.E. 901(b)(9). The trial court found that the images "are used in the course of the business of the Rankin County Tax Assessor's Office." The trial court further ruled that "these pictures are what they purport to be," which seemingly satisfies Mississippi Rule of Evidence 901(a), which, in pertinent part, says that "the proponent must produce evidence

sufficient to support a finding that the item is what the proponent claims it is" in order to authenticate a piece of evidence. M.R.E. 901(a).

¶61.    The comment to Rule 901(b)(9) states that "[t]his illustration covers systems such as x-rays, some chemical tests, and computers. Example (9) does not foreclose taking judicial notice of the accuracy of a process or system." M.R.E. 901(b)(9) cmt. In the context of a radar device, this Court has held that "a radar device reading should be deemed admissible only upon a showing of the radar device's accuracy." *Stidham v. State*, 750 So. 2d 1238, 1241 (Miss. 1999) (citing M.R.E. 901(b)(9)). In *Stidham*, a radar device indicated that the defendant had been driving 72 miles per hour in a 55 mile-per-hour zone. *Id.* at 1240. The Court held that the officer's testimony, that "he had used a tuning fork to test the accuracy of the radar device on three occasions on the day he stopped Stidham for speeding, and that all three testings showed a 'good' result," constituted a sufficient showing of the accuracy of the radar device for authentication purposes. *Id.* at 1241. *Stidham* also required, generally, proof showing that the operator of the radar device is qualified to operate the device, though expert qualifications are not required. *Id. See also Johnston v. State*, 567 So. 2d 237 (Miss. 1990) (holding that a showing of the accuracy of an intoxilyzer test is a condition precedent to the test's admissibility).

¶62.    Here, no objective test for verification of the accuracy of the Google Earth images was administered, and no evidence was adduced to show that Cooper was qualified to utilize the Google Earth historical imagery function. The cases applying Rule 901(b)(9) require a showing of accuracy as a predicate to admissibility. Cooper testified that the satellite images

34

were accurate and reliable, that he used the Google Earth historical imagery function in the regular course of his business, that he used the Google Earth historical imagery function on a regular basis, and that he had compared the Google Earth image with a map the county produces every five to ten years for accuracy comparison. But he did not explain how the satellite image came to be labeled with the "Douglas Walters Home" pinpoint, nor did he explain how Google Earth generated the "Imagery Date," which was the substance of the State's rebuttal. Therefore, a showing of accuracy, the condition predicate to admissibility under Rule 901(b)(9), was not met through Cooper's testimony.

¶63.	In another case, *U.S. v. Nava-Arellano*, 639 Fed. App'x 512, 513 (9th Cir. 2016), the Ninth Circuit Court of Appeals held that the district court had not abused its discretion in admitting Google Earth images. The court found that "[a]t trial, Agent Calligros satisfied the minimal burden to authenticate the Google Earth images by confirming that the photographs accurately depicted the area, the location of the border, and the approximate location where he arrested Nava. *Id.* The court noted the following:

> Agent Calligros testified about the many ways he knew the boundary line on the images was accurate: he regularly patrolled the area, and had done so for approximately a year and a half; he had hiked along the length of the border; and he had received training on the location of the border wherein he went to the border, and afterwards was shown the border on Google Maps by his field trainer. Agent Calligros testified that he had used a GPS device issued by United States Border Patrol to generate the coordinates, which were then plotted into Google Earth. Those coordinates corresponded with Agent Calligros' testimony about the location of Nava's arrest without reference to the Google Earth markings. Agent Calligros repeatedly identified the location based on his recollection of the arrest and his knowledge of the area. His testimony thus tended to show that the images accurately identified what they purported to identify.

*Id.*

¶64. Here, Cooper's testimony was not akin to that of Agent Calligros in *Nava-Arellano*. Cooper did not testify that he had familiarity with the property or that he had ever been there. He specifically stated that he did not observe the photographs being taken. He merely stated that he compared the Google Earth satellite images with aerial images taken by the county "on a 5 to 10-year basis." Moreover, Cooper's testimony exceeded that of Agent Calligros because Cooper stated that the Google Earth satellite images truly and accurately represented 138 Mary Miles Drive on or about May 2, 2010, November 4, 2011, and December 20, 2012. Cooper's testimony exceeded his knowledge.

¶65. The majority finds that Walters failed to object to the labels and date stamps contained within the satellite images at trial or on direct appeal. Walters objected to admissibility of the satellite image photographs. And Walters's counsel stated the following during the discussion, which occurred outside the presence of the jury, of the admissibility of the satellite image photographs under Mississippi Rule of Evidence 804(b)(5):

> What the State is saying now is that because we have Google Earth that takes satellite pictures from what? 30, 35, 40, 50, 60, 100-miles above us that since it's done by a satellite then it is totally and completely truthful and reliable. I take exception to that. I don't think it is totally and completely reliable and trustworthy.
>
> Judge, this -- this picture, the pictures he's wanting to offer into evidence, have a picture of a -- have an imprint of a thumbtack or something similar to a thumbtack on it.
>
> . . .

[A]ll I'm saying is, if you can alter the picture to put a thumbtack in it, you can alter the picture to do anything else when it was taken from 50 to 100-miles above the earth. I don't think it's trustworthy or reliable.

Moreover, objecting to the satellite image photographs' admissibility and raising the issue on appeal sufficiently preserves the issue of the admissibility of labels and date stamps contained within the photographs for appeal. The admissibility of these photographs was considered by the trial court and has been raised on appeal. The issue is not procedurally barred.

¶66.    Because I would give Walters a new trial, I respectfully dissent.

**KING, J., JOINS THIS OPINION.  DICKINSON, P.J., JOINS THIS OPINION IN PART.**